Charles Isaac WILSON, Jr.
*v.* STATE of Arkansas

CR 83-129

669 S.W.2d 889

Supreme Court of Arkansas
Opinion delivered June 4, 1984

*John W. Settle,* for appellant.

*Steve Clark,* Atty. Gen., by: *Velda West Vanderbilt,* Asst. Atty. Gen., for appellee.

DARRELL HICKMAN, Justice. Charles Isaac Wilson, Jr., was convicted of rape, aggravated robbery, and burglary, and sentenced to forty years and fined $15,000. He essentially makes three arguments on appeal: his identification by the victim was unreliable, improper verdict forms were submitted, and the victim's street address should not have been admitted because it identified the appellant as the "Yorkshire Rapist." We find no error and affirm.

The identification of the appellant by the victim was made after a voice lineup. Such identification is permissible. See *Kellensworth* v. *State,* 272 Ark. 252, 631 S.W.2d 1 (1982); *Rhea* v. *State,* 104 Ark. 162, 147 S.W. 463 (1912); *United States* v. *Scully,* 546 F.2d 255 (9th Cir. 1976), vacated and remanded on other grounds, *United States* v. *Cabral,* 430 U.S. 902 (1977); 2 Wigmore on Evidence § 660 (1979); J. Weinstein and M. Berger, *Weinstein's Evidence* § 901 (b) (5) [01] (1983). It is for the trial court to determine if there are sufficient aspects of reliability surrounding the identification to permit its use as evidence and then it is for the jury to decide what weight the identification testimony should be given. *Kellensworth* v. *State,* 278 Ark. 261, 644 S.W.2d 933 (1983); *Watkins* v. *Sowders,* 449 U.S. 341 (1981); *Manson* v. *Brathwaite,* 432 U.S. 98 (1977); *see also Weinstein's Evidence, supra.* We do not reverse a trial court's ruling on the admissibility of identification evidence unless it is clearly erroneous, *Kellensworth* v. *State, supra,* and do not inject ourselves into the process of determining reliability unless there is "a very substantial likelihood of irreparable misidentification." *Simmons* v. *United States,* 390 U.S. 377 (1968). That likelihood does not exist in this case.

The victim never saw her assailant. She saw a figure crouching in the doorway of her bedroom, and a quilt was immediately thrown over her head. But she said that the rapist talked to her for an hour and a half. She said that he seemed to be a foreigner and spoke in "broken" English. About three months after the attack and before she identified the appellant in the voice lineup, the victim received a telephone call from a man whom she recognized as her assailant and then concluded that he was a black man. Her testimony concerning the call is important; it reads:

Q.   Okay. What type of voice was it?

A.   I said it was like an Iranian-type voice.

Q.   Okay, now, when you say Iranian-type voice, what do you mean?

A.   Kind of like a broken English type. He would leave words out, like, "I cut you," and things on that order. He wouldn't put all the words together.

Q.   In other words, he spoke English but he would leave some of the grammar type things out?

A.   Yes.

Q.   Instead of "I'll cut you," it was, "I cut you"?

A.   "I cut you."

Q.   At the time did you feel like that you could recognize the voice if you heard it again, based upon the tone and quality?

A.   *I knew I could.*

Q.   *Did you have an occasion to hear that voice again later?*

A.   *Yes, I did.*

Q.   How was that?

A.   In — I got a phone call about in June and I had gotten a few phone calls before I had moved from the apartment, and when I would answer they would just hang up. Then I got one one morning and asked if Cheryl was there, and I went to the phone. When I got there, the person had hung up, and then about 4:00 that afternoon I got another phone call and he asked who it was, and I said it was Cheryl, and he said, he asked me what I was wearing, and I just told him it was none of his business, and he said something, you know, like, "Do you want me to come to your apartment on

Yorkshire?" And I said, "No," and he said, "What are you wearing?" and I said, "Well, I was wearing a robe," and he said, "Take it off," and I said, "No." We were just kinda bickering back and forth.

Q. Did he say anything else to you?

A. He told me I was the best.

Q. He said you were the best?

A. And I said, "Best what?" And he said, "You know."

Q. Tell us about the accent on that phone call.

A. It was — It was the voice of a colored man, but it was kind of like still leaving the words out, you know, certain — like he asked me, "You listen to me?" And I said, "Yes, I'm listening."

Q. So in other words, some of it was with leaving the words out and some of it wasn't?

A. Yeah.

Q. Like somebody wasn't keeping their words straight?

A. Yes, like he wasn't really trying, you know. It was just every once in a while, maybe, to get it through my head who I was really talking to or something.

Q. Now, did you later have occasion to hear the voice in the apartment again?

A. I did.

Q. Where was this?

A. At a lineup. (Italics supplied.)

Another unusual event occurred in this case. Prior to trial the appellant saw the victim and appeared to know her.

Her testimony is as follows:

> Q.  Did you have an occasion later to see him in this courthouse?
>
> A.  Yes, I did.
>
> Q.  Okay, and did he indicate to you that he knew who you were?
>
> A.  Yes, he did.
>
> Q.  How did he do that?
>
> A.  It was through his first trial.
>
> Q.  Okay, what did he do?
>
> A.  He walked in the room and —
>
> . . .
>
> Q.  Okay, Ms. Jackson, on the other occasion that you saw the defendant, did he focus his attention on you out of a room full of people?
>
> A.  I was sitting in the middle of about four or five women.
>
> Q.  Now, where did he look at you?
>
> A.  He looked straight at me and said, "Hello".
>
> Q.  What did he do?
>
> A.  Said, "Hello". And smiled.
>
> Q.  You, of all the people?
>
> A.  (Nodding in affirmative).
>
> Q.  Until this point, had you ever been identified as the victim in this rape case?
>
> A.  No.

Q. He did not see you at the lineup to your knowledge?

A. No, he didn't.

Q. Or at any other time?

A. No, he didn't.

Q. And you don't know — Again, you never knew the defendant before or after?

A. No.

Q. One more time. Is there any doubt in your mind the voice you heard in the lineup that you have now attached to the face of Charles Isaac Wilson was the voice of the man who assaulted you in your apartment the early morning hours of April 12th?

A. I am positive.

The jury could of course have given some weight to this testimony. These circumstances taken with the fact that the victim was positive about her identification of appellant strongly support the trial court's decision to allow the evidence to go to the jury.

The appellant also contends that the identification was unreliable because after the victim participated in the lineup she marked her choice in a room where there was a typewriter containing a sheet of paper with a list of the lineup participants; after the appellant's name was written the word "SUSPECT." The victim testified, however, that she saw no such list and was unaware of any piece of paper in the typewriter. The trial judge undoubtedly chose to believe the victim's testimony in determining the reliability of her identification and that is within his province.

The victim's initial description of her assailant as a man of five feet, six or seven inches, was based on her observation of him lying next to her. The appellant is six feet, one inch. In those circumstances it would obviously be very hard for

the victim to give a completely accurate estimation of height and we do not believe that the initial description contributed to "a very substantial likelihood of irreparable misidentification." Again, this was a question for the trial court and the jury.

The appellant argues that error was committed in allowing testimony by the victim after she had been hypnotized. Hypnosis was used to stimulate the victim's recall. The officer who attempted to hypnotize the victim, however, stated that she would not go into a trance; moreover, the victim stated that she was not hypnotized. During the sessions the victim told the officer the phrases that her assailant had spoken. Most of these, though, were the same phrases she recalled before any attempted hypnosis. This buttresses the testimony that she was not, in fact, hypnotized. Since the victim apparently was not hypnotized, the point has no merit.

The appellant also argues that the trial court erred in submitting modified verdict forms to the jury. The verdict forms allowed the jury to find the appellant guilty or not guilty of rape, aggravated robbery, and burglary. The forms for rape and aggravated robbery allowed the jury the additional choice of whether the crime was committed with a deadly weapon.

Ark. Stat. Ann. § 43-2336.1 (Supp. 1983) provides that any person who is found guilty of a felony involving the use of a deadly weapon, whether or not an element of the crime, shall be sentenced to a minimum of ten years in prison without parole. The modification of the verdict form was made to bring this statute into play. Since it clearly states that it is applicable whether or not the use of a deadly weapon is an element of the crime, and since the testimony revealed that the assailant threatened the victim throughout the crime with a knife, its inclusion was proper. The verdict forms reflected both the information under which the appellant was charged and the legal definition of the crimes and were therefore proper.

The offenses for which the appellant was convicted

were part of a series of charges against him all of which involved the rape of women living on Yorkshire Drive in Fort Smith. The news media sometimes referred to the attacker as the "Yorkshire Rapist." Before trial the appellant moved that no mention be made of the victim's address on Yorkshire Drive. The trial court denied the motion and her address was mentioned twice. In this regard the appellant argues that he was precluded from conducting an effective voir dire of the jurors as to their knowledge and bias about the Yorkshire Rapist because "it would have been impossible to ascertain knowledge without improperly disclosing prejudicial material." The appellant filed a pre-trial motion requesting a sequestered voir dire of the potential jurors. That motion was denied and the appellant chose not to question the jurors on the subject. On appeal, the appellant fails to object to denial of the motion. Because of these omissions there is no evidence that any of the jurors had heard of the Yorkshire Rapist, or if they had, that the recitation of the victim's street address enabled them to make that connection. Therefore, the point is without merit.

Affirmed.

PURTLE, HAYS, and HOLLINGSWORTH, JJ., dissent.

P. A. HOLLINGSWORTH, Justice, dissenting. Charles Isaac Wilson, Jr., the appellant was convicted in Sebastian County of rape, aggravated robbery, and burglary. He was sentenced to forty years in prison and fined $15,000. The majority affirms, and I strongly disagree.

The appellant's argument is that the prosecutrix's identification testimony was tainted by an unconstitutionally suggestive lineup and identification procedure an was therefore unreliable. I agree and would reverse the trial court as to this point.

The appellant filed a pretrial motion to suppress identification testimony. The prosecutrix had given a report to the police immediately following the assault on her person. She stated to the officers that she rolled over in bed and saw somebody crouching in her doorway who lunged

on top of her and covered her head with a blanket before she could get up. That was her only glimpse of the rapist who stayed with her for over an hour and a half. She described the rapist's voice as Iranian type, "kind of like a broken English type." She said he left out words "like 'I cut you' and things on that order. . . . He wouldn't put all the words together . . . It could have been a Cuban accent." She also estimated the rapist to be between 5'5" and 5'7" in height based on the time he spent lying next to her.

Between the date of the rape, April 12, and the identification of the appellant, four voice lineups were conducted. On April 14, the prosecutrix indicated that she heard a voice similar to her attacker's. The similar voice was a white male detective who was attempting to imitate a Spanish or foreign accent. In this one and the subsequent two, the lineups were not viewed by the prosecutrix; only their voices were heard. In the lineup where the appellant was identified, the prosecutrix viewed the lineup and simultaneously heard the five participants speak. Contrary to previous lineups, the prosecutrix was told by the police that a suspect was present in this lineup. While she was in the room marking her choice, a paper was in a typewriter in that same room with a list of the participants in the lineup clearly visible. After each participant's name was a physical description, with the exception of the appellant. The word "SUSPECT" appeared after his name. Several other people who walked through the room stated that they clearly saw the paper and its contents. The prosecutrix admitted seeing the typewriter in the room, but she denied having seen the list.

At the trial of this matter, the prosecutrix testified that she had received a phone call from the rapist. For the first time, at trial, she stated the voice of her attacker was that of a colored man. She buttressed her testimony by saying that she also saw the appellant at another one of his trials where he was accused of a similar charge and that he said hello to her there. She did not say that his voice was the same as her attacker. The prosecutrix states that the appellant speaking to her confirms in her mind that the appellant is the rapist.

*Manson* v. *Brathwaite,* 432 U.S. 98, 111-112 (1977) emphasized the troublesome characteristic of such evidence:

> The driving force behind *United States* v. *Wade,* 388 U.S. 218 (1967), *Gilbert* v. *California,* 388 U.S. 263 (1967) (right to counsel at a post-indictment lineup), and *Stovall,* all decided on the same day, was the Court's concern with the problems of eyewitness identification. Usually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress. The witness' recollection of the stranger can be distorted easily by the circumstances or by later actions of the police.

To guard against this danger we hold inadmissible evidence tainted by suggested confrontation procedures and lacking adequate indicia of reliability as is present here.

The appellant is a 6′1″ black male, American born and raised in Fort Smith, who does not speak with a foreign accent. There was testimony that appellant's voice has no trace of any accent and his vocabulary and voice are good. A review of the tape of his voice included in the record is in agreement with this characterization of appellant.

We have previously said that whether identification testimony is admissible is essentially a question of reliability. The opportunity to observe the criminal, the accuracy of the victim's description, the amount of certainty of the victim at the time of the confrontation, and the length of time between the crime and the identification are all factors to be weighed against any suggestions. *Washington* v. *State,* 273 Ark. 482, 621 S.W.2d 216 (1981); *McCraw* v. *State,* 262 Ark. 707, 561 S.W.2d 71 (1978). When all of these elements are considered, the identification in this case has serious defects. Immediately after the rape, the prosecutrix described her assailant as talking with an accent, having dark hair of medium length, being 5′5″ to 5′7″ tall, and having repeated such phrases as: "I want you money"; "I tie you up"; "I no hurt you". She indicated that all of these phrases are indicative of the mannerisms and the way the rapist speaks. The prosecutrix in this case instructed the

police that a man who was about 5'6" in height and spoke with a foreign accent attacked her. She subsequently identified the appellant, a 6'1" black man with no discernible accent.

We upheld a conviction partially based on a voice identification in a more recent case. In *Kellensworth* v. *State,* 278 Ark. 261, 644 S.W.2d 933 (1983), however, the prosecutrix was able to:

> clearly hear, partially view and sketchily feel her attacker over the period of an hour. . . . Immediately after the crimes the prosecutrix accurately described the criminal to the first arriving police officer. . . . Thus, the description given immediately after the crimes was consistent with the lineup identification. Her degree of attention was impressive. She made no misidentification.

Here, the prosecutrix was only able to hear her attacker. The physical description she gave the police turned out to be inaccurate as was her characterization of her attacker's voice. The identification stemming from the improperly conducted lineup should be excluded and the courtroom identification based on the lineup and identification that followed logically should be excluded as well. When viewing this case on the totality of the circumstances, I cannot say that the prosecutrix's identification of the appellant as her rapist is so reliable as to avoid the possibility of misidentification. I would reverse.

PURTLE and HAYS, JJ., join in this dissent.