721 A.2d 231

**Marquis Yaphet HOPKINS**

v.

**STATE of Maryland.**

**No. 25, Sept. Term, 1998.**

Court of Appeals of Maryland.

Dec. 11, 1998.

Claudia A. Cortese, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Regina Hollins Lewis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CATHELL, Judge.

Marquis Yaphet Hopkins, petitioner, was convicted at a bench trial in the Circuit Court for Baltimore County of robbery with a deadly and dangerous weapon, robbery, battery, two counts of assault, two counts of use of a handgun in the commission of a felony or crime of violence, and unlawfully carrying a handgun. He received sentences of ten years for the armed robbery conviction, three years consecutive for one of the assault convictions, and a concurrent five-year sentence without the possibility of parole for one of the handgun use convictions. His remaining convictions were merged for sentencing purposes.

Petitioner raised three issues on appeal to the Court of Special Appeals. That court affirmed his convictions, finding no merit in any of the questions presented. We granted the petition for certiorari on a single issue:

Did the trial court err in compelling [petitioner] to give a voice exemplar at trial?

We shall affirm.

## I. FACTS

The facts of this case were stated in the opinion of the Court of Special Appeals, *Hopkins v. State*, 118 Md.App. 715 [No. 612, 1997 Term, slip op. at 1–3, filed Dec. 24, 1997]:

Laurene Theresa McQuay, and her husband, Franklin Andrew McQuay were robbed at gun point outside their townhouse in Timonium, Maryland, shortly after 9:15 p.m. on 27 April 1996. Their testimony at trial established the following.

The McQuays were returning home from a restaurant. Mrs. McQuay had parked their car in the front of their townhouse. As Mr. McQuay exited from the passenger door, a man, later identified as the appellant, approached Mr. McQuay from the back and said, "Yo, check it out." As he spoke, the man placed a gun next to Mr. McQuay's head.

At this point in time, Mrs. McQuay was standing beside their car. The man ordered her to the front of the car. When she arrived, the man demanded that she hand over her money or her husband "would have his mother-fucking head blown off." She handed him her purse, wedding ring, and car keys. The man then said, "[g]ive me the necklace, bitch." As she turned her necklace around to undo the clasp, the man stepped within two feet of her and yanked the necklace off her neck. The man then reached into Mr. McQuay's pocket and removed his wallet. After he did this, the man hit Mr. McQuay on the head with the butt of the gun, knocking him to the ground. The man then ran away.

Dizzy from the blow to his head, Mr. McQuay stayed on the ground a few seconds after the man fled. The McQuays then ran inside their house. Mr. McQuay called 911. When asked to described the robber, Mr. McQuay handed the telephone to Mrs. McQuay who told the police that the

robber was a black male, wearing a dark hooded sweatshirt, and "almost" six feet tall.

A little over a month later, on June 6 $^{th}$, Officer Mark G. Carter of the Baltimore County Police Department asked Mrs. McQuay to look at a photographic array to see if she could make an identification. She picked out appellant's photograph as a picture of the man who had robbed them. She wrote on the back of the photograph, "The man in the photo looks very close to the actual guy. His profile is extremely close. I need to see him in person to be sure, I need to hear him speak too." She then signed her name to the back of the photograph. Her husband was unable to identify anyone from the photographic array.

At trial, Mrs. McQuay testified that the robbery lasted only a few minutes, and that during that time she was directly in front of the assailant and between two and ten feet from him at different times. She also testified that the area where the robbery occurred was reasonably well-lit by their front house light and a nearby street lamp.

## II. DISCUSSION

During the cross-examination of Mrs. McQuay, the following occurred:

Q. [By Defense Counsel] You wanted a lineup. And were you ever afforded a lineup, Ma'am?

A. No.

Q. In fact you said, "I need to see him in person to be sure"?

A. I also wanted to hear him speak.

Q. And you were never afforded that opportunity either, were you?

A. No.

Q. And that was eight, nine months ago, correct?

A. Correct.

On redirect examination, the following exchange occurred:

Q. [By the State's Attorney] How certain are you that that's the person who robbed you sitting next to [Defense Counsel]?

[DEFENSE COUNSEL]: Objection, objection.

THE COURT: I'll sustain.

Q. Is there any question in your mind that that's the person who robbed you?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

Q. Would you like to have him stand up and speak?

A. Yes.

[DEFENSE COUNSEL]: Wait a minute, wait a minute. Don't be so accommodating.

[STATE'S ATTORNEY]: Your Honor, I'd ask the Court's permission to require the Defendant to stand up and make a statement.

[DEFENSE COUNSEL]: Your Honor, I'm going to object to that. *The opportunity to do that is long since past.*

[STATE'S ATTORNEY]: Your Honor, I think it's certainly within the Court's discretion. This case comes down to the identification. For the man to stand up—it's her identification that makes the case, quite frankly.

[DEFENSE COUNSEL]: I don't disagree with that. I don't disagree with that.

THE COURT: What do you wish the Defendant to say?

First of all, the question is you would like him to stand. Do you object to that?

[DEFENSE COUNSEL]: No.

THE COURT: Would you stand, sir?

[STATE'S ATTORNEY]: The statement which I would request the Court to order the Defendant to say is, "Yo, check it out."

THE COURT: Pardon? You'd like him to say what?

[STATE'S ATTORNEY]: "Yo, check it out." That is what the witness indicated—

THE COURT: "Yo, check it out." All right. Do you object to that?

[DEFENSE COUNSEL]: I do, your Honor. *This occurred nine months ago.*

THE COURT: All right. That would go to the weight, not admissibility. You can tell him to say that. Objection noted for the record.

Please state that, sir.

THE DEFENDANT: Yo, check it out.

THE COURT: You may be seated, sir.

Q. [By the State's Attorney] My question is: How certain are you that the Defendant seated next to [Defense Counsel] is the person who robbed you and your husband?

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

Before [the State's Attorney's] question was—"Do you have any question in your mind?" is what he said to you.

A. Absolutely not. [Emphasis added.]

On recross-examination by defense counsel, Mrs. McQuay testified:

Q. [By Defense Counsel] Ma'am, what is that distinguished by his voice that distinguishes him from other African Americans?

[STATE'S ATTORNEY]: Objection.

THE COURT: Overruled.

A. He's articulate.

Defense counsel's only grounds for objecting to the voice exemplar being elicited in the court trial were: "The opportunity for that is long since past" and "[t]his occurred nine months ago." The trial court, responding to the express grounds proffered for the objection, stated that the nine-month period between the offense and the in-court voice

exemplar "would go to the weight, not admissibility." On recross-examination, after petitioner gave the voice exemplar, defense counsel elicited from Mrs. McQuay that what distinguished petitioner's voice was that he was "articulate." Petitioner made no further objection nor did he move to strike the testimony based upon Mrs. McQuay's reason for recognizing the voice exemplar. The objections we noted above were the only objections ever made to the voice exemplar, namely, that the opportunity to object "is long since past" and the voice exemplar was being given nine months after the incident. At no time was a Fifth Amendment or any other ground for the objection presented to the trial court.

Petitioner completely failed to proffer to the trial court the ground for objection that he now presents to this Court. A serious question of whether the issue was preserved for appellate review exists. Although the State has raised the preservation issue as to certain arguments made by petitioner, it proffers that the issue of the articulateness of the defendant's exemplar is preserved. We fail to discern from the record where any objection or motion to strike was made by petitioner during recross-examination when the "articulate" testimony first appeared. We also question whether the issue of articulateness was preserved for appellate review. Nonetheless, the Court of Special Appeals exercised its discretion to address these issues on their merits. The same issues were presented to this Court in the petition for writ of certiorari, and the issue of the admissibility of the voice exemplar was contained within the writ granted. We shall address the issues presented.

## A. THE FIFTH AMENDMENT

The United States Supreme Court said in *Schmerber v. California*, 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966), that the Fifth Amendment "offers no protection against compulsion ... to write or speak for identification...." In *United States v. Wade*, 388 U.S. 218, 222–23, 87 S.Ct. 1926, 1930, 18 L.Ed.2d 1149 (1967), the Court held that when used as an identifying physical characteristic and not as

a testimonial admission, voice exemplars compelled during a lineup do not violate the Fifth Amendment. What is more, in *Wade* the Supreme Court stated that "even to utter words purportedly uttered by the [person who committed the crime]" was not testimonial in nature because he was required only to "use his voice as an identifying physical characteristic," not to disclose his knowledge of any particular fact. *Id.*

The Supreme Court extended the holding of *Wade* to recorded voice exemplars compelled by a grand jury subpoena in *United States v. Dionisio,* 410 U.S. 1, 5–7, 93 S.Ct. 764, 767–68, 35 L.Ed.2d 67 (1973) and later in *Pennsylvania v. Muniz,* 496 U.S. 582, 592, 110 S.Ct. 2638, 2645, 110 L.Ed.2d 528 (1990), where it held that a videotape portraying the defendant's slurred speech after being arrested for drunk driving was admissible. The Court reasoned that "[r]equiring a suspect to reveal the physical manner in which he articulates words, like requiring him to reveal the physical properties of the sound produced by his voice, see *Dionisio, supra,* does not, without more, compel him to provide a 'testimonial' response for purposes of the privilege." *Muniz,* 496 U.S. at 592, 110 S.Ct. at 2645, 110 L.Ed.2d 528.

This Court recognized the earlier cases in *Andrews v. State,* 291 Md. 622, 627–30, 639–40, 436 A.2d 1315, 1317–18, 1323–24 (1981), where we held that a defendant could be compelled to refrain from shaving his head and facial hair during trial to prevent him from altering his appearance from what it was during the time of the incident. Quoting from *Schmerber,* 384 U.S. at 764, 86 S.Ct. at 1832, 16 L.Ed.2d 908, we stated:

[B]oth federal and state courts have usually held that [the Fifth Amendment privilege] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, *to write or speak for identification, to appear in court, to stand,* to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling "communications" or "testimony," but that compulsion which makes a suspect or

accused the source of "real or physical evidence" does not violate [the Fifth Amendment].

*Andrews,* 291 Md. at 628, 436 A.2d at 1318 (emphasis added). We also quoted from *Wade,* 388 U.S. at 222–23, 87 S.Ct. at 1930, 18 L.Ed.2d 1149: "Similarly, compelling Wade to speak within hearing distance of the witnesses, even to utter words purportedly uttered by the robber, was not compulsion to utter statements of a "testimonial" nature; he was required to use his voice as an identifying physical characteristic, not to speak his guilt." *Andrews,* 291 Md. at 629, 436 A.2d at 1318. The Court of Special Appeals also has followed *Wade* and *Dionisio* in holding that an accused can be compelled to read from a transcript at trial. *Vandegrift v. State,* 82 Md.App. 617, 639, 573 A.2d 56, 66, *cert. denied,* 320 Md. 801, 580 A.2d 219 (1990).

This essentially is what occurred in the case *sub judice.* Petitioner was not required to testify as to his guilt or innocence. The exemplar was required expressly for purposes of identification. Mrs. McQuay stated that she could identify petitioner positively by the exemplar because of his "articulateness," that is, a physical characteristic of his voice. This simply is not the type of compelled testimony protected by the Fifth Amendment privilege.

■ Moreover, we discern little difference in a Fifth Amendment analysis of whether the voice exemplar was testimonial in nature because of the context in which it was given, here during the trial. Although the court may have compelled petitioner to repeat the phrase "yo, check it out," that petitioner was required to give an exemplar in court as opposed to pre-trial is of no consequence; his statement was not testimonial because it was used for identification purposes only, not "to relate a factual assertion or disclose information," *Doe v. United States,* 487 U.S. 201, 210, 108 S.Ct. 2341, 2347, 101 L.Ed.2d 184 (1988), or "to speak his guilt." *Wade,* 388 U.S. at 223, 87 S.Ct. at 1930, 18 L.Ed.2d 1149. The exemplar was non-testimonial and, therefore, not protected by the Fifth

Amendment's prohibition against compelled incrimination. *See Dyson v. State*, 238 Md. 398, 404, 209 A.2d 609, 612 (1965) ("This Court, as have many others, consistently has held that requiring a suspect . . . to present his physical attributes as an aid or guide to identification, does not amount to requiring the suspect to incriminate himself . . . ."), *reh'g denied*, 238 Md. 546, 547, 210 A.2d 730, 731 (1965), *vacated on other grounds by* 383 U.S. 106, 86 S.Ct. 717, 15 L.Ed.2d 617 (1966).

Petitioner argues that because Mrs. McQuay already had identified him based on his physical appearance, the voice exemplar was unnecessary and its real purpose was not to identify him as the assailant but to prove that he was capable of threatening Mrs. McQuay. In other words, petitioner alleges the purpose of the voice exemplar was testimonial in nature and in violation of *Wade* and *Dionisio*. As the Supreme Court has noted, however, for compelled statements "to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a 'witness' against himself." *Doe*, 487 U.S. at 210, 108 S.Ct. at 2347, 101 L.Ed.2d 184 (footnote omitted). Further, the Court in *Dionisio*, 410 U.S. at 7, 93 S.Ct. at 768, 35 L.Ed.2d 67, commented that voice recordings are not testimonial when "used solely to measure the physical properties of the [defendants'] voices, not for the testimonial or communicative content of what was to be said."

Taken in context, Mrs. McQuay's in-court visual identification had been subjected to question on cross-examination. A purpose on redirect examination for eliciting the voice sample was to bolster the testimony of Mrs. McQuay with respect to her prior visual identification of petitioner. It appears from the record that the statement "yo, check it out," was, among the statements made by the assailant during the crime, the statement least likely to relate to substantive evidence. The need to rehabilitate Mrs. McQuay's identification testimony supported the relevancy of the voice exemplar. For all of these reasons, we hold that petitioner's Fifth Amendment

right against testimonial compulsion was not violated.[1]

## B. ADMISSIBILITY: RELEVANCE AND RELIABILITY

The decision of whether to admit a voice exemplar "is a matter left to the sound discretion of the trial judge." *Vandegrift,* 82 Md.App. at 639, 573 A.2d at 66. Trial judges are afforded "broad discretion in the conduct of trials in such areas as the reception of evidence." *Void v. State,* 325 Md. 386, 393, 601 A.2d 124, 127 (1992) (quoting *McCray v. State,* 305 Md. 126, 133, 501 A.2d 856, 860 (1985)). Accordingly, in our appellate review, we extend the trial court great deference in determining the admissibility of evidence and will reverse only if the court abused its discretion. *Robinson v. State,* 348 Md. 104, 121, 702 A.2d 741, 749 (1997) ("The determination of whether specific evidence is relevant in a given case rests with the trial court, and that determination will not be disturbed on appeal absent a clear abuse of discretion."); *Merzbacher v. State,* 346 Md. 391, 404–05, 697 A.2d 432, 439 (1997) (explaining that appellate courts generally will not reverse a trial court on issues of the admissibility of relevant evidence unless a clear abuse of discretion can be shown); *Williams v. State,* 342 Md. 724, 737, 679 A.2d 1106, 1113 (1996) ("A trial judge's determination on relevance will not be reversed absent an abuse of discretion."); *Ricks v. State,* 312 Md. 11, 31–32, 537 A.2d 612, 622, *cert. denied,* 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988) (refusing to reverse trial court for allowing videotape identification); *Straughn v. State,* 297 Md. 329, 334, 465 A.2d 1166, 1169 (1983) (noting that admissibility of police identification photographs "is a discretionary matter for the trial court."); *Schear v. Motel Management Corp.,* 61 Md.App. 670, 682, 487 A.2d 1240, 1245–46 (1985) ("[A] determination as to relevance is left to the discretion of the trial judge.").

This Court has not had occasion to determine when trial courts may admit in-court voice identification evidence. A

---

1. The applicability, if any, of Article 22 of the Maryland Declaration of Rights was not presented or briefed. Accordingly, it is not addressed.

number of other jurisdictions, however, have. The Supreme Court of Nebraska has noted, for example, that "the nontestimonial nature of a voice exemplar does not automatically require its admission into evidence. The [party seeking admission] must still show that the voice exemplar is relevant and reliable." *State v. Newman*, 250 Neb. 226, 244, 548 N.W.2d 739, 752 (1996). The New York Court of Appeals also has held that "[t]he test of whether voice exemplar evidence should be admitted ... [is] whether it is relevant and reliable." *People v. Scarola*, 71 N.Y.2d 769, 777, 530 N.Y.S.2d 83, 525 N.E.2d 728, 732 (1988) (citing *United States v. Esdaille*, 769 F.2d 104, 107 (2d Cir.), *cert. denied*, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985)).

In Maryland, evidence, including a voice exemplar offered for identification purposes, is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable" than it would have been without the evidence. Md. Rule 5–401. Even if relevant, however, evidence can be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." Md. Rule 5–403. Other states have adopted the same methodology. *See Scarola*, 71 N.Y.2d at 777, 530 N.Y.S.2d 83, 525 N.E.2d at 732 (applying the same rules of relevancy to exemplar evidence); *see also People v. Davis*, 151 Ill.App.3d 435, 439, 104 Ill.Dec. 283, 502 N.E.2d 780, 783 (1986), *cert. denied*, 114 Ill.2d 548, 108 Ill.Dec. 420, 508 N.E.2d 731 (1987) (explaining that trial court has "wide discretion" to weigh whether probative value of in-court voice identification was substantially outweighed by prejudicial effect); *Commonwealth v. Thomas*, 394 Pa.Super. 316, 323, 575 A.2d 921, 924–25 (1990) (noting that trial courts have "far-reaching discretion" with respect to compelling a defendant to don clothing, including evaluating the act's probative value (quotation omitted)).

In considering the reliability of a voice exemplar, other courts have noted the problems unique to this form of identification evidence. For example, voice exemplars, as compared

to other forms of personal demonstrative evidence like scars or tattoos, are easy to feign for purposes of trial. *See Newman,* 250 Neb. at 245, 548 N.W.2d at 752 (noting that "[a]n accent can be exaggerated or muted through a person's conscious efforts, such as avoiding particular words that one cannot pronounce without an accent."); *see also Esdaille,* 769 F.2d at 107; *Scarola,* 71 N.Y.2d at 778, 530 N.Y.S.2d 83, 525 N.E.2d at 732. Some courts have adopted a list of factors enunciated by the Supreme Court in *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), to consider in determining the reliability of identification evidence when due process challenges are at issue:[2] (1) the ability of the witness to hear the assailant speak, (2) the witness's degree of attention, (3) the accuracy of any prior identifications the witness made, (4) the period of time between the incident and the identification, and (5) how certain the witness was in making the identification. *See Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *United States v. Duran,* 4 F.3d 800, 803 (9th Cir.1993), *cert. denied,* 510 U.S. 1078, 114 S.Ct. 894, 127 L.Ed.2d 87 (1994). Relevance and reliability are considered separately. If the exemplar is irrelevant, reliability is not an issue because the evidence is inadmissible. It is only when identification evidence is relevant in the first instance that reliability need be assessed. Generally, it is in the assessment of reliability that the *Biggers* test has been utilized. The majority of jurisdictions adopting the *Biggers* factors determine reliability based on a two-pronged test:

> The admissibility of a challenged in-court identification is subject to a two part test. Initially, we must decide if the identification procedure was unduly suggestive. If the threshold determination that an identification was suggestive is made, we then examine whether the identification

---

2. As we discuss *infra,* no due process issues were raised directly in the case *sub judice.* Some courts, however, also have considered the *Biggers* factors relative to reliability.

was "so reliable, in view of the totality of the circumstances, as to prevent a substantial likelihood of misidentification." *Rodriguez v. Peters,* 63 F.3d 546, 556 (7th Cir.1995) (citation omitted). *See also United States v. Kwong,* 69 F.3d 663, 666 (2d Cir.1995), *cert. denied,* 517 U.S. 1115, 116 S.Ct. 1343, 134 L.Ed.2d 491 (1996) (applying the two-pronged test to determine whether a pretrial identification procedure tainted the subsequent in-court identification). The second prong of the reliability inquiry is when courts consider the five factors set forth in *Biggers. See, e.g., Rodriguez,* 63 F.3d at 557; *United States v. Rutledge,* 40 F.3d 879, 889 (7th Cir.1994), *rev'd on other grounds,* 517 U.S. 292, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996); *United States v. Tortora,* 30 F.3d 334, 338 (2d Cir. 1994); *United States v. Larkin,* 978 F.2d 964, 970 (7th Cir. 1992), *cert. denied,* 507 U.S. 935, 113 S.Ct. 1323, 122 L.Ed.2d 709 (1993); *United States v. Hill,* 967 F.2d 226, 230 (6th Cir.), *cert. denied,* 506 U.S. 964, 113 S.Ct. 438, 121 L.Ed.2d 357 (1992); *United States v. Rundell,* 858 F.2d 425, 426 (8th Cir.1988); *State v. Clausell,* 121 N.J. 298, 326, 580 A.2d 221, 234 (1990). This inquiry into reliability "is the linchpin in determining the admissibility of identification testimony...." *Manson,* 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d 140.

The majority of the cases applying the distinct two-step reliability process, however, are constitutional due process cases. That is, the criminal defendants alleged the identification procedures, whether in-court or pre-trial, were so impermissibly suggestive and unreliable that they deprived the defendant of his or her right to due process. As we previously have noted, no such violation has been alleged in the case before us. We shall utilize the relevancy-reliability determination, taking into consideration the five *Biggers* factors only with respect to the reliability issue, as various other courts have done when reviewing the admissibility of identification evidence.[3]

---

3. Several courts have utilized the two-pronged test for admitting identification evidence notwithstanding that no due process claims were made. *See, e.g., Duran,* 4 F.3d at 802–03; *United States v. Carbajal,* 956

In *State v. Bolanos,* 743 S.W.2d 442, 446 (Mo.Ct.App.1987), the Missouri Court of Appeals used the *Biggers* factors to find a voice identification admissible. The court noted that the witness had heard the assailant's voice several times, had a high degree of attention after having been threatened with a knife, had given a prior description, and demonstrated certainty in her voice identification. *Id.* Similarly, a victim's identification of the defendant's voice in a voice line-up was held admissible in *Wilson v. State,* 282 Ark. 551, 553–57, 669 S.W.2d 889, 891–92 (1984). In that case, the Supreme Court of Arkansas said the voice line-up was reliable despite its suggestive nature because the assailant, who had a distinct accent, spoke often during the crime and called and approached the victim after the incident. *Id.* Additionally, the victim, in her identification of the assailant, was "positive." *Id.* at 557, 669 S.W.2d at 892. In *Scarola,* 71 N.Y.2d at 778–79, 530 N.Y.S.2d 83, 525 N.E.2d at 733, the Court of Appeals of New York held the trial court did not abuse its discretion in rejecting a proposed voice exemplar by the defendant because, essentially, the exemplar was not reliable. In two cases consolidated for appeal, the defendants presented defenses of mistaken identity and alibi. At one of the defendant's trials, the victim testified that her assailant had no noticeable speech impediment and she could understand his statements during the robbery. That particular defendant sought to introduce evidence that he had a speech impediment. The other defendant sought to introduce similar evidence at his trial. In each case, the Court of Appeals affirmed the trial courts' rulings denying admission of the exemplars because those exemplars were unreliable. The appellate court reasoned:

> In neither case did the victim rely on defendant's voice to identify him. Moreover, the foundation for the admission of the evidence, in each case did not rule out the possibility that defendants could feign the existence of a speech defect.

F.2d 924, 929 (9th Cir.1992), *cert. denied,* 510 U.S. 900, 114 S.Ct. 272, 126 L.Ed.2d 223 (1993); *United States v. Gregory,* 891 F.2d 732, 734–35 (9th Cir.1989); *State v. LaCasse,* 9 Conn.App. 79, 82–84, 516 A.2d 145, 147, *cert. denied,* 201 Conn. 815, 518 A.2d 72 (1986).

Even the speech therapist, called as an expert witness . . . testified that he could have "camouflaged" any speech problem. . . .

*Id.*

## C. RESOLUTION

■ We turn now to the case at hand and petitioner's compelled voice identification. Mr. McQuay was unable to see his assailant sufficiently to identify him. Mrs. McQuay's testimony as to the identity of the assailant, therefore, was material to the outcome and, as such, highly relevant. Mrs. McQuay was the only witness who observed the assailant under circumstances conducive to reliability. She had identified him previously in a pretrial photographic lineup. Additionally, Mrs. McQuay already had visually identified petitioner in the courtroom as the assailant prior to the exemplar. Her in-court identification, however, had been challenged during cross-examination. The voice exemplar, produced during her redirect examination, was proffered to bolster the parts of her direct testimony questioned during cross-examination. In that context, the exemplar was highly probative. Therefore, we believe the exemplar was relevant in identifying petitioner as the assailant.

Maryland Rule 5–403 states:

**Rule 5–403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.**

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The rule provides that if evidence is relevant, as was this voice identification evidence, it is excludable only if it is substantially outweighed by "unfair prejudice." This potential for prejudice, however, does not automatically render voice identification inadmissible. *See, e.g., Davis,* 151 Ill.App.3d at 439, 104 Ill.Dec. 283, 502 N.E.2d at 783 ("[In-court identification] evi-

dence which is otherwise relevant will not be excluded simply because it tends to prejudice the accused."). Here, the trial court required petitioner to repeat words used during the commission of the crime: "Yo, check it out." Although utilizing words spoken during the commission of the crime may cause some prejudice to petitioner, that prejudice did not rise to a level that would substantially outweigh the probative value of the identification as required by the rule.[4] Thus, we fail to see how the prejudice in this case was unfair.

Petitioner argues because voice identification is a less reliable means of identification, it is more prejudicial than other means of identification. Even presuming that to be true,[5] in the context of this case, the in-court voice identification on redirect examination, after a significant cross-examination attacking Mrs. McQuay's visual identifications of petitioner, had high probative value.

Moreover, we believe the exemplar was sufficiently reliable under the totality of the circumstances. Although the period of time between when Mrs. McQuay first heard her assailant and then identified him in the courtroom was approximately nine months, such a period of time has not been held too lengthy under similar circumstances. *See Rodriguez*, 63 F.3d at 557 (affirming trial court's admission of in-court identification when nine months elapsed between the crime and the in-court identification); *cf. Hogan v. State*, 908 P.2d 925, 929

---

**4.** Although the voice exemplar used here, "Yo, check it out," was the first statement made by the defendant during the incident, it alone, in the context of this incident, does not constitute a reenactment. We recognize that generally a defendant may not be forced to reenact the alleged offense. Md. Rule 4–263(d)(1).

**5.** *Commonwealth v. Marini*, 375 Mass. 510, 517, 378 N.E.2d 51, 56 (1978), notes that "at least where a witness has a basis for an identification of the culprit by sight, he should not be asked to make a voice identification unless [the witness] himself suggests it." This is exactly what occurred in this case. Mrs. McQuay requested a lineup and voice exemplar after she had identified petitioner from the photo array. Although neither request was satisfied before trial, we assume that Mrs. McQuay had a reason for requesting a voice exemplar, namely that she could distinguish the robber's voice sufficiently to help identify her assailant.

(Wyo.1995) (holding nine-month period between incident and in-court identification did not undermine reliability given other considerations). Here, Mrs. McQuay heard the petitioner say many things, including his order for her to go to the front of the car, to give him her money, "give everything we had or my husband would have his . . . head blown off. And he repeated that many, many times." Additionally, she heard him say "[g]ive me the necklace, bitch," from a distance of two feet. Mrs. McQuay was subjected to a barrage of threatening comments from petitioner. Moreover, Mrs. McQuay remembered that the perpetrator had been "articulate."

A standard definition of articulate is "uttered clearly in distinct syllables . . . using language easily and fluently. . . ." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 85 (unabr. ed.1983). During the incident, Mrs. McQuay took special notice of petitioner's voice because, despite his use of slang and threatening language, he enunciated each word distinctly, without slurring his speech. Her identification of petitioner's voice was based, at least in part, on this distinctive aspect of his speech—its articulateness. It buttressed her prior visual identification of him, and rehabilitated whatever degree of uncertainty that petitioner's cross-examination may have created.

 Petitioner asserts the means used to obtain the voice exemplar renders it unreliable because it was inevitable that, after hearing petitioner speak, Mrs. McQuay would identify him as the robber. Petitioner also argues that, at the time he was compelled to give the voice exemplar, no other African–Americans of his age were present in the courtroom. In other words, petitioner challenges the method of identification as suggestive.[6] We disagree. Mrs. McQuay already had identified petitioner twice before he gave the voice exemplar. As *Webster v. State*, 299 Md. 581, 601, 474 A.2d 1305, 1315 (1984),

---

**6.** The issue referred to generally as "impermissible suggestiveness" is, as we have said, normally the first prong of a due process reliability challenge. Nonetheless, we address petitioner's argument, treating it as a challenge to reliability under his evidentiary inadmissibility claim.

explains, even though an identification is suggestive, it will be admissible if it is reliable. *See also Manson,* 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d 140. Considering Mrs. McQuay's previous identification of petitioner in a photo lineup and her assertive identification in-court without the voice exemplar, we find that the voice identification, even if suggestive, did not cause any "irreparable misidentification" because it was sufficiently reliable.

■ Finally, once identification testimony has passed the threshold of relevance and reliability, issues affecting credibility of the in-court identification go to its weight, not its admissibility. For example, in *Dyson,* 238 Md. at 402–03, 209 A.2d at 611–12, the victim failed to identify the defendant both in a lineup and when he was brought before her in a police station. Only after the defendant spoke did the victim recognize him. We held the victim's failure to identify the defendant before he spoke would affect the weight of her subsequent identification of his voice, not its admissibility. *Id.* at 403, 209 A.2d at 612.

■ More recently, the Pennsylvania Superior Court held that "[a]ny discrepancies between the conditions during the in court identification and those during the robbery were for the [trier of fact] to weigh in assessing the weight to be given to the witness's identification testimony." *Thomas,* 394 Pa.Super. at 326, 575 A.2d at 926. In *State v. Brooks,* 49 N.C.App. 14, 22, 270 S.E.2d 592, 598 (1980), *appeal dismissed,* 301 N.C. 723, 276 S.E.2d 285 (1981), the North Carolina Court of Appeals noted that although the identification witness "refused to identify the defendant positively, he was unshakable in his assessment of defendant's voice as being 'very familiar to' the one he had heard at the robbery." *Id.* The court then held that any lack of certainty in that identification affected the credibility of the witness, not the admissibility of his identification. *Id. See also Hornsby v. State,* 210 Ga.App. 571, 573, 436 S.E.2d 767, 768–69 (1993) ("That the victim was unable to identify defendant previously was a matter which went to the weight, not the admissibility, of the victim's

testimony."). Accordingly, once the voice exemplar passed the relevance and reliability threshold, the nine-month delay between the robbery and the voice exemplar went to the weight of the evidence, not its admissibility. This is precisely what the trial court ruled as to defense counsel's objection.

■ We hold that the compelled voice exemplar was admissible. The evidence was material and had great probative value to the court as trier of fact that was not substantially outweighed by any prejudice to petitioner. Nor does the record reflect that the exemplar was unreliable. Therefore, the trial court did not abuse its discretion in admitting the voice identification testimony.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**