5 A.3d 27

**In re ELRICH S.**

**No. 101, Sept. Term, 2009.**

Court of Appeals of Maryland.

Sept. 24, 2010.

Marc A. DeSimone, Jr., Asst. Public Defender (Elizabeth L. Julian, Acting Public Defender, of Baltimore, MD), on brief, for petitioner/cross-respondent.

Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, of Baltimore, MD), on brief, for respondent/cross-petitioner.

Argued before BELL, C.J., HARRELL, GREENE, MURPHY, ADKINS, BARBERA, and JOHN C. ELDRIDGE (Retired, Specially Assigned) JJ.

ADKINS, J.

During a hearing to vacate Petitioner's earlier delinquency adjudication, the judge charged the Office of the Public Defender ("OPD") with "essentially post convicting [its] own lawyers" and ordered it to panel the case to an attorney wholly independent of that office. Petitioner was claiming ineffective assistance of counsel, and the judge was concerned that the self-damning affidavit submitted by Petitioner's previous OPD trial counsel was the product of coercion. While exercising her official duties in unrelated matters, the judge had learned of an internal OPD assessment program in which Baltimore County OPD juvenile lawyers were evaluated with the potential for adverse employment consequences. One of Petitioner's post-delinquency counsel was an investigator for the program and Petitioner's trial counsel may have been among those under evaluation. For these reasons, the judge struck the affidavit of trial counsel because there was an insufficient "Chinese Wall" separating Petitioner's trial counsel from his post-delinquency attorney. The issues in this appeal arise from that decision, as well as the judge's later refusal to recuse herself, and her denial of Petitioner's Motion to Vacate his delinquency adjudication. We shall affirm in part, and reverse in part.

## FACTS AND LEGAL PROCEEDINGS

Following investigations into two intentionally set fires at a Baltimore County apartment building, the State of Maryland filed a delinquency petition against Petitioner Elrich S. alleging that he had engaged in two acts of first-degree arson. An apartment tenant had identified Elrich as one of two males seen standing over burning papers that generated the second fire. Elrich was arrested, advised of his rights under *Miranda,* and then interviewed. During the interrogation, Elrich provided detectives with a statement in which he admitted

to being present at the scene of both fires, and to lighting the second one himself ("Elrich's statement"). Elrich also repeatedly claimed that he was seventeen years old, but a review of his criminal records revealed that he was only fourteen, a fact that was later confirmed by his guardian.

At the juvenile proceedings, Elrich was represented by an Assistant Public Defender assigned to the Baltimore County district office of OPD (hereinafter referred to as "delinquency counsel" or "previous counsel"). On the day of the hearing, Elrich's delinquency counsel received a copy of the court ordered psychological evaluation of Elrich ("the Report"), which indicated that Elrich's cognitive abilities may be "significantly below" normal. Elrich's delinquency counsel understood that the Report "had particularly significant relevance to the voluntariness of Elrich's statement to police, which [would] affect[ ] the statement's admissibility at trial." The Report was submitted to the court, but, for reasons unknown, delinquency counsel did not use it at the hearing to attack the validity of Elrich's statement. For example, she did not argue to the court that the statement was tainted by Elrich's diminished capacity. Furthermore, she did not seek to suppress Elrich's statement, even though she believed that it was "the only substantive piece of evidence connecting [Elrich] to the arson."

Elrich plead not delinquent to all charges. The parties agreed to a stipulated statement of facts in front of the Juvenile Master, and the following was articulated to the court:

[O]n July 25, 2007, Detective Hughes responded to [the apartment building] at 1:15 a.m. . . . [He] responded there as a result of a fire in the building. Upon arrival there, Detective Hughes met with a Fire Investigator Slagle, and Investigator Slagle conducted an origin and cause investigation of the fire scene. He determined the fire was intentionally set. Unknown persons at that time had pried open the mailbox in the lobby of the building. Once the box was opened, the individual applied open flame to the available combustible materials which appeared to include various

papers and mails from inside the mailboxes. The fire caused scorching to the paint on the wall and to the mailbox where the papers were found. On July 25th, 2007 at approximately 9:40 a.m., . . . Detective Hughes was requested to respond to a second fire call at the same apartment building. At that time, Investigator Leidner responded to the scene and conducted a second origin and cause investigation. The inspector determined the second fire to be an intentional act as well. This fire involved newspaper advertisements left on the floor of the lobby of that building. The fire was reported by a tenant in the building, Mr. Edward Boutchyard. He reported seeing two male subjects bent down on the floor in the area of below the mailbox. He investigated and found that the papers were on fire. The witness took the papers outside and stamped out the fire with his foot prior to reporting it. As a result of the call to 911, Officer Nesbitt arrived on the scene and located the two subjects observed by the witness. Officer Nesbitt placed these subjects under arrest and transported them to Precinct 11. . . . Detective Hughes met with [Elrich], and advised him of his rights per Miranda. . . . [Elrich] . . . agreed to give a statement to Detective Hughes. During the written oral statement, Elrich admitted to being present at the scene of both fires. When describing the fire, the second fire that was at approximately 9:30 in that morning, he at first denied any involvement even though he admitted he was in the building. After a short conversation, however, Elrich admitted that he had lit the fire because he was bored. . . . Elrich [also] talked about being present at the fire, the first fire.

The court accepted the facts and found Elrich delinquent.[1] It placed Elrich into supervised detention.

Four months after his delinquency hearing, Elrich filed a motion to vacate his delinquency finding on the grounds that

---

1. The Juvenile Master found Elrich involved in one count of first-degree arson and the State entered a *nolle prosequi* to the other count.

his counsel was ineffective.[2] At this juncture, Elrich was represented by the Chief Attorney (hereinafter referred to as "motions counsel" or "current counsel") of OPD's Juvenile Protection Division ("JPD").[3] Elrich alleged that previous counsel failed to adequately inform him of the nature of the charges, the consequences of a delinquency finding, the strength of the State's case, his right to a fair and impartial trial in which the State must prove the substance of its petition beyond a reasonable doubt, his ability to contest the Master's order, his right to suppress certain information, and his right not to testify at trial. Attached to the motion was a signed affidavit by Elrich's delinquency counsel ("the Affidavit"), who averred to, among other failures in her representation, "fail[ing] to zealously advise [Elrich] of the likelihood of success if the statement had been suppressed."

The parties appeared on the motion before the Circuit Court for Baltimore County, sitting as a juvenile court. During the hearing, Elrich was represented by both his motions counsel and Marc DeSimone, an Assistant Public Defender assigned to OPD's Appellate Division.[4] Elrich's delinquency

---

2. Maryland Rule 11–116 governs the modification or vacation of a juvenile court order. Rule 11–116 provides in relevant part:

 a. Revisory Power. An order of the court may be modified or vacated if the court finds that action to be in the best interest of the child or the public, except in cases involving commitment of a child to the Department of Health and Mental Hygiene for placement in a State mental hospital. . . .

3. According to the OPD website, its Juvenile Protection Division ("JPD") serves as "a specialized statewide division to monitor the conditions of confinement of all OPD juvenile clients committed to the care and custody of the Department of Juvenile Services (DJS). The JPD is also responsible for protecting the individual rights of juveniles who are committed to DJS facilities, ensuring the safety and appropriateness of their placements and assuring the timely implementation of juvenile court orders." Maryland Office of the Public Defender, Juvenile Protection Division (JPD), http://www.opd.state.md.us/juvenile.html (last visited September 17, 2010).

4. The OPD's Appellate Division "represents OPD clients in direct appeals from the circuit courts to Court of Special Appeals of Maryland. If the Court of Appeals of Maryland or the United States Supreme Court

counsel was also present at the hearing, not in a representative capacity, but instead as a witness subpoenaed by the State. Before the parties reached the merits, however, the judge expressed skepticism about the circumstances surrounding the OPD's acquisition of the Affidavit, and the following colloquy occurred:

> THE COURT: I, quite frankly, am troubled by the fact that someone who is in essence a supervisor has filed a— obtained an affidavit from somebody under their supervision of the nature of the affidavit that was filed in this case. I think that there is an ethical and conflict issue that I am raising because it is of concern to me.
>
> * * *
>
> [Motions Counsel]: I can clear up the Court's misinformation about the fact that I am not [delinquency counsel's] supervisor.
>
> THE COURT: I'm aware of that but it was also my understanding from discussions within your office that there was a court watch of sorts where you and others came around and evaluated performance of lawyers in Baltimore County and that as a result of that, certain things happened within the Baltimore County office.
>
> [Motions Counsel]: That your Honor has that knowledge means that someone from my office has had ex parte communications with the Court.
>
> THE COURT: No. I have that knowledge actually by talking to the public defender on other issues unrelated to this case who talked about the supervision project that was done, so I didn't have ex parte communications about this case. I, quite frankly, am troubled that you would say that I did.
>
> But I did have communication with your office where it was described to me that there was a supervision project, a

grants further review, the Appellate Division will represent clients there as well." Maryland Office of the Public Defender, Appellate, http://www.opd.state.md.us/appellate.html (last visited September 17, 2010).

court watch of sorts. As a result of that, various things happened. One of the things in that discussion were concerns about certain cases that people watched and evaluated. From the description that was provided to me in that context, this would appear to be one of those cases. So to then have an affidavit from the lawyer who was assigned done, presumably at the request of someone in your—in the office, and filed, is troublesome to me.

\* \* \*

[Motions Counsel]: [W]e did not write that affidavit. We did not. In fact, I believe if the Court heard from [delinquency counsel], the Court would understand that we did write an affidavit. [Elrich's delinquency counsel] took exception with the affidavit that we wrote and she wrote her own. That is the affidavit that appears attached to the motion that was filed in this case.

THE COURT: It doesn't change the circumstances that you all are essentially post convicting your own lawyers.

\* \* \*

[Motions Counsel]: I am not sure I understand what the problem is.

THE COURT: You don't see a conflict?

[Motions Counsel]: If your Honor is suggesting that [delinquency counsel] signed this affidavit because she was afraid she was going to lose her job or there was a threat of a removal from her job, there is absolutely no way that the Court can make that assumption.

\* \* \*

But to speak to whether or not the juvenile protection division should be filing these things, collateral is a division—collateral review is a division of the same agency that we are with.[5] They also file post conviction. That is their sole job.

---

**5.** The OPD Collateral Review Division ("CRD") "provides representation for state post conviction hearings, as well as coram nobis, state

THE COURT: But this was carefully set up so that this was supervised differently, monitored differently. There is this whole Chinese wall theory that surrounds that unit for precisely this reason. As far as I can tell it does not exist within your juvenile unit. There are enough people that are troubled on the adult side that you have this specter of one unit, same office post convicting another lawyer in the same unit of that office. But, for a lot of reasons that happened and there was a Chinese wall built so that these ethical issues wouldn't be problematic.

One of the things that is of concern to me is it doesn't seem to have even been contemplated in this circumstance.

\* \* \*

[T]o me, if you think there is a problem, refer it out, have someone independent of you all take a look at the file, whatever they think is appropriate. Then you don't have this specter of your office, which does have some oversight and review function, getting affidavits from a lawyer who stands to be impacted by how you perceive her performance, how you perceive her cooperation, how you perceive the whole matter.

(Footnote added). The court remained dissatisfied with current counsel's explanation of events and shortly thereafter called a recess to allow that attorney to determine how she would proceed.

When the case was recalled, DeSimone spoke to the court, contending that no conflict existed because the Public Defender's office is considered a "law firm only on a county by county basis[,]" meaning that there are separate chains of command and walls of separation between the county units and state units. Therefore, "[a]n attorney in the Baltimore County office is not the same unit, is not within the conflict of the statewide unit." DeSimone also explained that his Appellate

---

habeas corpus, motions to reopen, parole revocation, and extradition hearings." Maryland Office of the Public Defender, Collateral Review, http://www.opd.state.md.us/collateralreview.html (last visited September 17, 2010).

Unit is similar to the Collateral Review Division ("CRD") in that it is separate from any of the county units and that its review of lawyers in those other units does not present any conflict. DeSimone offered to strike the affidavit and call Elrich's delinquency counsel to the witness stand to testify about the adequacy of her representation. His argument, however, did not allay the court's concerns, and it struck the Affidavit. The court further stated that it would hold the case open, but asked that it be "paneled to another lawyer[,]" an attorney "independent of the office."

Following the hearing, Elrich, still represented by his motions counsel, filed two motions in the Circuit Court: a Motion for Recusal and a Motion to Reconsider the ruling. In his Motion for Recusal, Elrich asserted that the court referred to several "extrajudicial" conversations, wherein it learned of the OPD's "court watch" program, which could lead a reasonable observer to question its impartiality. Thus, only the judge's recusal would avoid this appearance of impropriety. He alleged that the court's apparent prejudice and bias lead it to strike the Affidavit and order the case paneled out to an independent attorney without hearing any testimony or arguments on the merits of the action.

In his Motion to Reconsider, Elrich asserted that the Circuit Court did not have the authority to order the OPD to panel the case to an independent attorney. Elrich also used the Motion to argue the merits of his request to vacate his delinquency finding. First, he contended that the two-count Petition charging Elrich for two identical counts of first-degree arsons occurring on the same day and at the same location violated his due process rights because there was no way that he could identify each count according to its related event. Elrich further contended that the facts as stipulated could not support any finding of arson because, at most, the fire scorched the mailbox and wall of the building. Arson requires that the building be actually burned; a mere scorching will not suffice. Finally, Elrich claimed ineffective assistance of counsel because his previous counsel did not challenge the sufficiency of the State's evidence to support a finding of

arson. Elrich requested a hearing for the parties to argue the merits of his Motion to Reconsider.

Thirty-five days after Elrich filed his motions, and nearly two months after the parties appeared before the Court on Elrich's original Motion to Vacate, the court denied Elrich's motions without an additional hearing. In its written opinion, the court explained that recusal was not warranted because it simply possessed a general awareness of the JPD's evaluation of attorneys in the OPD's Baltimore County Office, one that was not the result of any inappropriate ex parte communications. The court stated that it "had no conversations concerning the specifics of this case or the Affidavit with members of the OPD before hearing this matter." It emphasized that to characterize every conversation with an attorney that is not related to any ongoing representation as an ex parte communication would "severely compromise[ ]" the "Court's ability to communicate with and accommodate any number of difficulties that arise in the daily juggle by OPD to meet staffing demands[.]"

In refusing to reverse its earlier decision ordering OPD to panel the case to "outside counsel[,]" the court reiterated its previous statement that the JPD does not have the same separation functions in place as the CRD:

> Unlike the Collateral Review Division, where counsel enter their appearances in post-convictions and other occasional post-trial matters, and where the originally assigned OPD has no ongoing role in such proceedings, there is no clear demarcation for cases that involve JPD attorneys. In my experience in Baltimore County, many post-commitment matters continue to be handled by County OPD staff. In some instances, JPD staff become involved, enter their appearance, and assume all further representation. In still other instances, JPD have appeared before me in a role more akin to co-counsel in matters relating to placement.

The Circuit Court also rejected the assertions made by motions counsel and DeSimone that JPD's evaluations of County attorneys had little, if any, effect on that attorney's job. It

observed that "[f]ollowing the report from [the JPD] Balti-more County assessment, the head of the County juvenile unit was re-assigned." The judge acknowledged that any action taken as a result of a report is "properly and solely within the discretion of the Public Defender[,]" but that the evidence indicated that JPD is not a separate division.

The court also decided to address Elrich's original Motion to Vacate in its opinion. Acknowledging that there was "no clear authority authorizing the action" sought by Elrich, it neverthe-less recognized its power to vacate delinquency orders pursu-ant to the broad revisory powers granted in Maryland Rule 11–116, "Modification or Vacation of Order." Looking at the merits, the court determined that if it were to grant the requested relief, "there would be a strong argument that re-trial would be barred by the Double Jeopardy clause[,]" and that it would not be in Elrich's best interest "to simply terminate these proceedings with no further supervision or services." The court further reasoned that counsel never contended that Elrich was innocent of committing a delinquent act, but instead simply argued "that other counsel should have defended the merits more aggressively and/or mitigated the seriousness of the charge." It concluded that it would not be in Elrich's best interest to strike the delinquency finding.

Elrich appealed to the Court of Special Appeals, and, in an unreported opinion, the intermediate appellate court affirmed the Circuit Court. We granted Elrich's Petition for Writ of Certiorari and the State's Cross–Petition [6] to consider the following issues:

(1) Whether a motion to vacate under Rule 11–116 is an Appealable Order.

(2) [Whether Rule 11–116 is an available vehicle for raising a claim of ineffective assistance of counsel.[7]]

---

6. *In re Elrich S.,* 410 Md. 702, 980 A.2d 482 (2009).

7. We have rephrased the second issue to more clearly convey the substance of the dispute. The exact phrasing was: "Whether the circuit court erred in denying Mr. S.'s Motion to Vacate his juvenile

(3) Whether the juvenile judge erred in failing to recuse herself from further participation in this case after she made clear that her order, requiring the Office of the Public Defender to strike its appearance, was based upon opinions derived from out-of-court conversations with persons unrelated to the case.

(4) Whether a judge may order the Office of the Public Defender to strike its appearance in a case and provide a private "panel" attorney to represent the accused.

(5) Whether the lower court erred in failing to vacate [Elrich's] juvenile delinquency finding.

## DISCUSSION

### I. Standard of Review

In a juvenile delinquency matter, an appellate court will "review the case on both the law and the evidence." Md. Rule 8–131(c). We review any conclusions of law *de novo,* but apply the clearly erroneous standard to findings of fact. *See In re Anthony W.,* 388 Md. 251, 261, 879 A.2d 717, 722 (2005). We use the same evidentiary standard of review in juvenile delinquency proceedings as we apply in criminal cases:

> Appellate review of the [trial] court's judgment on the evidence is limited to determining whether there is a sufficient evidentiary basis for the court's underlying factual findings. [T]he appropriate inquiry is not whether the reviewing court believes that the evidence establishes guilt beyond a reasonable doubt, but rather, whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.* at 261, 879 A.2d at 722 (quoting *In re Timothy F.,* 343 Md. 371, 380, 681 A.2d 501, 505 (1996)). The hearing court's ultimate decision, however, will not be disturbed unless "there

delinquency finding on the basis that, assuming Mr. S.'s attorney was ineffective, it would not be in Mr. S.'s best interests to vacate the delinquency finding?"

has been a clear abuse of discretion." *In re Yve S.*, 373 Md. 551, 586, 819 A.2d 1030, 1051 (2003).

## II. Analysis

*A. Rule 11–116 Motion to Vacate As An Appealable Order*

■ On cross-petition, the State urges this Court to dismiss Elrich's appeal on the grounds that a ruling on a Rule 11–116 motion is not a final, appealable order. It contends that a Rule 11–116 ruling is not final because Elrich is not procedurally barred from continuing to make Rule 11–116 motions to the lower court while an appellate court is reviewing his original Rule 11–116 motion. Thus, the State contends, a ruling on any one of the subsequent motions could render his appeal moot. *See In re Julianna B.*, 407 Md. 657, 967 A.2d 776 (2009) (dismissing as moot an appeal from a circuit court denial of juvenile's Rule 11–116 motion to modify the terms of her commitment following the success of juvenile's subsequent Rule 11–116 motion requesting home visits). This Court, however, has expressly rejected this argument and considered the merits of an appeal from a Rule 11–116 ruling. In *In re Leslie M.*, 305 Md. 477, 505 A.2d 504 (1986), the State challenged the appealability of a motion under Rule 11–116's predecessor, Rule 916(a).[8] We characterized the Rule 916(a) motions as requests to vacate earlier delinquency orders and summarily denied the State's motion to dismiss. *Id.* at 478, 505 A.2d at 505. Here, the Circuit Court considered Elrich's motion and rejected it in full. It is clear from the record that

---

**8.** Maryland Rule 916(a), the rule in effect at the time of *In re Leslie M*, 305 Md. 477, 505 A.2d 504 (1986), is substantively identical to Maryland Rule 11–116, the rule relevant in this case. Rule 916(a) provided in pertinent part:

 a. Revisory Power.

 An order of the court may be modified or vacated if the court finds that action to be in the best interest of the child or the public, except in cases involving commitment of a child to the Department of Health and Mental Hygiene for placement in a State mental hospital. In cases involving such commitment the court shall proceed as provided in Rule 915.

*In re Leslie M*, 305 Md. at 479 n. 1, 505 A.2d at 506 n. 1.

the court did not intend to take any further action on the motion, meaning that its order denying Elrich's motion is a final one. Accordingly, Elrich's case is properly before this court. We turn now to the merits of the action.

## B. Authority To Adjudicate Ineffective Assistance of Counsel Claims Under Rule 11–116

Elrich contends that the Circuit Court "refused to recognize that [Elrich's] claims [of ineffective assistance of counsel] were a basis for relief under Maryland Rule 11–116." [9] A review of the record, however, defeats this argument. In its written opinion, the court said:

> "The Juvenile Causes article does not recognize what would typically be considered to be post-conviction relief. *However, Maryland Rule 11–116 grants the Court revisory power over delinquency orders.* The Court may modify or vacate such orders sua sponte or in response to a petition, and a hearing is required only in instances where the relief sought is for revocation of probation. In other instances the Court may grant or deny relief without a hearing."

(Emphasis added). The court then articulated the standard under the Rule for determining whether to modify or vacate an order, i.e. whether it is "in the best interest of the child or the public[,]" and proceeded to deny Elrich's motion on those grounds.

We agree with the Court of Special Appeals that the Circuit Court, "even in expressing doubt about the utilization of Rule 11–116 as a post-conviction vehicle, did just that." Thus, we reject Elrich's assertion and affirm the Court of Special Appeals on this issue.

## C. Recusal

■ Elrich next contends that the juvenile court judge was required to recuse herself because her earlier discussions with

---

**9.** Both parties agree that Rule 11–116 is the appropriate vehicle through which those determined to be delinquent can raise ineffective assistance of counsel claims. The true dispute centers on whether the juvenile court judge understood this when rendering her judgment.

then State Public Defender, Nancy Forster, regarding the OPD's internal review of its employees' performance constituted improper *extra-judicial* communications that destroyed the judge's impartiality. According to Elrich, the judge's bias was evident from her *sua sponte* challenge of the Affidavit. He alleges that the "adversarial system was abandoned in favor of an inquisitorial one" because, "by raising the issue, supporting it with her own knowledge, and ruling upon the issue, [the judge] functionally occupied counsel table, the witness stand, and the bench at the same time." The State counters by arguing that not all knowledge acquired by a judge outside of the courtroom is impermissible "extra-judicial" knowledge, and that it would lead to preposterous results to require any judge who has learned of a potential ethical problem in an attorney's continued representation of a client to recuse herself.

▮ Canon 3D of the Maryland Code of Judicial Conduct governs judicial recusal. *See* Cannon 3(D), Md. Rule 16–813. That section provides in relevant part: "A judge shall recuse . . . herself from a proceeding in which the judge's **impartiality** might reasonably be questioned, including an instance when . . . the judge has a personal bias or prejudice concerning a party or a party's lawyer or extra-judicial **knowledge** of a disputed evidentiary fact concerning the proceeding. . . ." *See id.* at Cannon 3(D)(1)(a) (emphasis in original). The official comment to Cannon 3D explains that "a judge must recuse . . . herself whenever the judge's impartiality might be reasonably questioned, regardless of whether any specific instances in 3D(1) apply." Yet, "[t]here is a strong presumption in Maryland, and elsewhere, that judges are impartial participants in the legal process, whose duty to preside when qualified is as strong as their duty to refrain from presiding when not qualified." *Attorney Grievance Comm'n v. Shaw,* 363 Md. 1, 11, 766 A.2d 1028, 1033 (2001). This Court has previously articulated the standard in recusal cases:

> The decision to recuse oneself ordinarily is discretionary and will not be overturned except for abuse. The party requesting recusal has a heavy burden to overcome the

presumption of impartiality and must prove that the judge has a personal bias or prejudice against him or her or has personal knowledge of disputed evidentiary facts concerning the proceedings.

*Id.* (quotation marks and citations omitted).

 We have also said that a judge is not required to "completely put out of his mind all that he had heard before in [the] case in order to be competent to sit." *Doering v. Fader,* 316 Md. 351, 358, 558 A.2d 733, 737 (1989). "[T]he alleged prejudice must result from an extrajudicial source and parties cannot attack a judge's impartiality on the basis of information and beliefs acquired while acting in his or her judicial capacity." *Boyd v. State,* 321 Md. 69, 77, 581 A.2d 1, 5 (1990) (quoting *United States v. Monaco,* 852 F.2d 1143, 1147 (9th Cir.1988)). Even information learned outside of the present case, such as that "acquired by the trial judge as a result of prior judicial proceedings involving codefendants[,]" will not automatically necessitate exclusion. *Id.* at 76, 581 A.2d at 4. Moreover, a disqualifying prejudice cannot be definitively established simply from the exercise of related judicial functions. *See United States v. Haldeman,* 559 F.2d 31, 133 n. 301 (D.C.Cir.1976) (holding that judge's prior supervision of grand jury matters did not warrant dismissal, despite the judge's discussion of "procedural matters with prosecutors before the indictment in [the] cases was returned[,]" because "the discussions occurred as a part of his official duties").

Here, the judge's knowledge of the OPD's supervision project stemmed from conversations she had with the State Public Defender and others on "issues unrelated to [Elrich's] case[.]" She explained:

... [A]s the judge in charge of the juvenile dockets in this County, I was certainly aware of ongoing observations of the juvenile docket that were conducted by the [JPD] of the OPD. Every judge and master who routinely hears delinquency cases in this County was aware of that fact. I meet regularly with various groups of delinquency case stakeholders, and the impact of the JPD review on the morale of the

OPD staff was the subject of occasional comment in my presence on several occasions. However I had no conversations concerning the specifics of [Elrich's] case or the Affidavit with members of the OPD before hearing this matter.

... [T]he fact that a member of the bench has a conversation with an attorney that is not, in any way, related to any ongoing representation is not an ex parte communication.

Elrich's motions counsel also acknowledged that the conversations were "in connection with something else." There is nothing in the record to suggest that the judge had any specific knowledge as to whether Elrich's delinquency counsel had, herself, been the subject of a JPD evaluation or whether the rumored consequences of such assessments affected that attorney's decision to submit a self-condemning affidavit. In short, the judge did not have "personal knowledge of disputed evidentiary facts concerning the proceedings." *Shaw*, 363 Md. at 11, 766 A.2d at 1033.[10] We will not require the Circuit Court judge to recuse herself simply because, through the exercise of her judicial functions, she became generally aware of the JPD's ongoing program.

■ Additionally, the juvenile judge's knowledge of the OPD attorney evaluations did not relate to the issue of whether previous counsel actually provided effective assistance of counsel at Elrich's delinquency hearing, but rather led the judge to inquire on the record regarding a potential conflict and the voluntariness of the Affidavit. We have said that "[t]rial judges are afforded broad discretion in the conduct of trials in such areas as the reception of evidence." *Hopkins v. Maryland*, 352 Md. 146, 158, 721 A.2d 231, 237 (1998) (quota-

---

**10.** Elrich incorrectly relies on *Smith v. State*, 64 Md.App. 625, 498 A.2d 284 (1985) to support his argument that recusal was required. In *Smith*, the judge used his law clerk to investigate whether the defendant failed to appear for a drug screening because of her pregnancy or because of drug-related activity. *See id.* at 628–29, 498 A.2d at 285–86. There, unlike here, the judge endeavored to obtain extra-judicial information specific to a party in court by requiring his law clerk to contact the hospital and then testify as a witness. *See id. Smith*, however, is radically different from this case, where no such out-of-court investigation of the parties occurred.

tion marks omitted). Moreover, "there is no question that the trial judge has broad discretion to control the conduct in his or her courtroom. . . ." *Biglari v. State,* 156 Md.App. 657, 674, 847 A.2d 1239, 1249 (2004). We believe that it was reasonable, in light of the possible conflict arising from OPD's supervision program, for the juvenile judge to be skeptical about of delinquency counsel's self-condemnation. More importantly, upon developing this skepticism about the attorneys' relationship, the court was required to raise the issue at Elrich's hearing in order to determine if that conflict existed and could be cured, or strike a potentially corrupt affidavit. *See Duvall v. State,* 399 Md. 210, 234, 923 A.2d 81, 96 (2007) (holding that when the trial court is notified of a potential conflict and fails to take adequate steps to investigate the potential for conflict or requires conflicted representation, despite the conflict, *"reversal is automatic,* without a showing of prejudice of adverse effect upon representation.") (emphasis added). We will not allow tainted evidence or potentially unethical conduct to find shelter in the harbor of Cannon 3D.

In sum, we agree with the Court of Special Appeals that there is nothing in the record to support "a conclusion that [the juvenile judge] learned, extra-judicially, any information that would have required her to recuse herself from the merits of Elrich's Motion to Vacate." Because Elrich did not meet his "heavy burden" of proof, we find no abuse of discretion.

### D. Ordering Referral Of Case To Outside Counsel

Elrich also challenges the validity of the order requiring OPD to panel the case to an outside attorney. He asserts that, in Section 6(f) of Article 27A ("Public Defender Act"),[11] the General Assembly established only two situations in which a court may appoint counsel. That section provides:

---

11. On October 1, 2008, Section Article 27A was recodified as Title 16 of the Criminal Procedure Article. Because the events at issue in this case occurred on or before February 26, 2008, we will refer to the provisions of Article 27A, the version of the statute in effect at the time.

(f) *Authority of courts to appoint counsel in certain situations.*—Nothing in this article shall be construed to deprive any court mentioned in § 4(b)(2) of this article of its authority to appoint an attorney to represent an indigent person where there is a conflict in legal representation in a matter involving multiple defendants and one of the defendants is represented by or through the Office of the Public Defender, or where the Office of the Public Defender declines to provide representation to an indigent person entitled to representation under this article.

Clearly, Elrich's situation does not fall into either one of the scenarios expressly provided for by Section 6(f). Yet, this does not mean that the Circuit Court lacked the authority to appoint counsel.

First, Elrich overlooks the nature of Section 6(f) as a limitation on the other provisions of the Public Defender Act. There is nothing contained in the section to preclude a court from appointing counsel in situations not enumerated in the statute. Rather, we have said that "the General Assembly provided in Art. 27 A, § 6(f), a clear oversight and corrective role for the courts in the ... appointed-counsel process." *Office of the Public Defender, et al. v. State,* 413 Md. 411, 432, 993 A.2d 55, 68 (2010). Second, Elrich ignores a court's inherent power over the judicial process:

"We made the point with unmistakable clarity ... that the power generally to regulate matters regarding the profession and its practitioners, are reposed inherently in the judiciary, that the obligation of the judicial branch of government to monitor and manage its own house are not hollow proclamations of power, for the placement of this responsibility with the judiciary represents a recognition of the special, and to a degree unique relationship that has evolved over the years between the legal profession and the tribunals of justice it serves, and that, although the Legislature may act to aid the courts in the performance of their judicial functions, the judicial branch nonetheless retains the fundamental authority and responsibility to carry out its

constitutionally required function, and aspect of which ... is the supervision of practicing lawyers."

*Post v. Bregman*, 349 Md. 142, 163, 707 A.2d 806, 816 (1998) (quotation marks and citations omitted). This power cannot be encroached upon by the legislative or executive branch. *See Wynn v. State*, 388 Md. 423, 433, 879 A.2d 1097, 1103 (2005) ("Inherent authority provides courts the means both to employ the power and fulfill the functions granted expressly to the judiciary by the Maryland Constitution as well as to resist encroachments by the legislative and executive branches."). "A judge must, of course, have the ability to control his or her courtroom, to assure that judicial proceedings are conducted fairly, efficiently, and with dignity and decorum." *Liner v. State*, 62 Md.App. 381, 391, 489 A.2d 553, 558 (1985). "Accordingly, the Circuit Court has the inherent power to appoint counsel to represent a petitioner when the court believes counsel would be necessary to further the interest of justice." [12] *Arey v. State*, 400 Md. 491, 509, 929 A.2d 501, 512 (2007).

 In this case, the juvenile judge had a legitimate interest in determining whether the contents of the Affidavit regarding previous counsel's competency at Elrich's delinquency hearing was improperly influenced by current counsel's status as an attorney within the OPD who, the judge noted, could have a "significant impact on her employment, how she is perceived, how she is reviewed, how she is evaluated, her tenure." Furthermore, the juvenile judge was aware

---

12. Recently, this Court has addressed the issue of a judge's ability to appoint an OPD attorney following that office's erroneous denial of representation of an indigent defendant. Our opinions in *Workman v. State*, 413 Md. 475, 993 A.2d 94 (2010), and *Office of the Public Defender, et al. v. State*, 413 Md. 411, 993 A.2d 55 (2010), set forth the rule that "the trial court, in carrying out its role as 'ultimate protector' of the Constitutional right to counsel, may appoint an attorney from the local OPD to represent the indigent individual unless an actual and unwaived or unwaivable conflict of interest would result thereby." *Office of the Public Defender*, 413 Md. at 434, 993 A.2d at 69.

that the lines of separation between the JPD and County OPD in connection with "post-commitment" matters was not consistent or clear:

> In some instances, JPD staff become involved, enter their appearance, and assume all further representation. In still other instances, JPD have appeared before me in a role more akin to co-counsel in matters relating to placement. There is nothing remotely similar to the separation of function that exists with the Collateral Division in the manner in which the JPD has functioned in delinquency matters in the County.

The Circuit Court had the inherent right to ensure that the evidence presented was accurate and not the product of coercion. Thus, "to further the interest of justice," it had the discretion to strike the Affidavit and appoint new counsel to resolve the conflict.

The court, however, did not have the right to order that OPD panel the case to an attorney entirely independent of the office because its discretion to assign new counsel was limited to ameliorating the existing potential for coercion. We have recently held that the Public Defender Act does not exclude OPD staff from the pool of attorneys a court could appoint as counsel for an indigent. *See Office of the Public Defender, et al. v. State,* 413 Md. 411, 432–433, 993 A.2d 55, 68 (2010) ("Art.27A, § 6(f), contains no language indicating a legislative intent to prohibit the appointment of an attorney from the local OPD by a trial court to represent an individual that the court determines qualifies as indigent. . . ."); *see also Workman v. State,* 413 Md. 475, 490, 993 A.2d 94, 103 (2010) ("[T]he Circuit Court should have appointed directly an attorney from the local OPD as [defendant's] counsel[.]"). Furthermore, as the juvenile court here recognized, a "Chinese Wall" existed between the County OPD and the Collateral Review Division of the OPD, where CRD "counsel [would] enter their appearances in post-convictions and other occasional post-trial matters, and . . . the originally assigned OPD

[would then have] no ongoing role in such proceedings...." [13]
Co-counsel, DeSimone,[14] also explained to the court that the same "clear demarcation" existed between the County OPD staff and his Appellate Division. If true, Elrich's hearing could have continued uninterrupted and DeSimone's representation would have resolved the dilemma without the extra costs associated with paneling a case to outside counsel.[15] Yet the court did not attempt to investigate whether the problem extended only to certain divisions within the OPD, leaving other divisions free of any taint. The interests of justice are not furthered by excluding OPD attorneys unnecessarily. Thus, the juvenile judge abused her discretion in summarily precluding all OPD staff from representing Elrich.

### E. Elrich's Juvenile Delinquency Finding

Finally, Elrich asks us to review, on the merits, his earlier delinquency finding. He contends that the lower court erred in denying his motion to vacate for two reasons, the first being that the "State failed to introduce evidence sufficient to prove all requisite elements of the crime of Arson in the First

---

**13.** The OPD asserts that the Collateral Review Division does not handle juvenile cases. That issue, however, is not before this Court for review.

**14.** DeSimone entered his appearance the morning of the hearing and introduced himself to the court as appearing on Elrich's behalf.

**15.** In its November 2009 audit of the OPD, the General Assembly concluded that:

... the cost of Maryland's public defender operation on a per case basis ($443) was the lowest and the cost per capita ($16) was among the lowest when compared to similar operations. When compared to the two other states with at least 100,000 cases opened per year, Maryland had significantly more attorneys on staff, and only used outside attorneys when necessary (for example, in cases in which a conflict of interest existed). This appears to result in a significantly lower cost per case in Maryland when compared to other states such as Massachusetts or Wisconsin that used outside attorneys for many more cases. In other words, paying private attorneys appears to result in higher per case costs.

Maryland General Assembly, Office of Legislative Audits, *Office of the Public Defender: Performance Audit Report* at 10 (November 2009) (available at http://www.ola.state.md.us/Resports/Performance/OPDPerf 09.pdf) (last visited September 17, 2010).

Degree." According to Elrich, at most, he "set fire to various objects within the building, but never 'set fire to' the building itself" and that a " 'mere scorching' of the wall is, as a matter of law, insufficient to establish a burning." Alternatively, Elrich claims that the lower court "erred in not addressing or resolving [his] claims of ineffective assistance [of counsel], and vacating the delinquency due to previous counsel's ineffective assistance." The State, on the other hand, presents several reasons why the lower court properly denied Elrich's request. First, the State asserts that Elrich's motion was no longer supported by "any competent evidence" once the lower court struck the Affidavit, and that even if the Affidavit had been admitted, it did not "define how [Elrich] was at all prejudiced by the alleged misconduct of his attorney." Second, the State contends that Elrich is improperly attempting to litigate the sufficiency of the evidence "in a collateral action rather than availing himself of his right to direct appeal." Finally, the State claims that Elrich engaged in first-degree arson, or at a minimum attempted first-degree arson, when he set fire to the papers inside the lobby mailbox. Thus, the lower court did not err in denying his motion to vacate because it properly determined that, either way, Elrich had committed "an act which would be a crime if committed by an adult."

When addressing the parties' specific arguments, we are mindful that "the General Assembly has enacted statutes carefully crafted to address the specific needs of adolescents and children." *In re Keith W.*, 310 Md. 99, 106, 527 A.2d 35, 38 (1987). The Juvenile Causes Act, codified at Md.Code (1974, 2006 Repl.Vol., 2008 Cum.Supp.) § 3–8A–01 *et. seq.* of the Courts and Judicial Proceedings Article ("CJP."), "grant[s] jurisdiction in juvenile courts over young offenders and establish[es] the process for treating them, to advance its purpose of rehabilitating the juveniles who have transgressed to ensure that they become useful and productive members of society." *Lopez–Sanchez v. State*, 155 Md.App. 580, 598, 843 A.2d 915, 926 (2004). The Act is to "be liberally construed to effectuate [its] purposes." CJP § 3–8A–02(b). Under the Act,

juveniles who, in the absence of the juvenile justice system, would be prosecuted in, and punished by, the adult criminal justice system, are instead afforded supervision and treatment, with the aim to achieve rehabilitation. Thus, a juvenile found by the juvenile court to have committed a "delinquent act," that is, an act that, if committed by an adult, would constitute a crime, is adjudicated a delinquent; and in disposition, the court will fashion a plan of supervision, treatment, and rehabilitation appropriate to the juvenile and serving the rehabilitative goals of the Act.

*Lopez–Sanchez,* 155 Md.App. at 598, 843 A.2d at 926. Accordingly, juvenile proceedings are civil, rather than criminal in nature. *See In re Anthony R.,* 362 Md. 51, 69, 763 A.2d 136, 146 (2000).

Once a juvenile court has pronounced a child to be delinquent, the court's order may be reviewed on appeal, or by an action pursuant to Rule 11–116. The latter course may be initiated by a court on its own motion, or by the "petition of any party or other person, institution or agency having supervision or custody of [the juvenile]." Md. Rule 11–116(b). As we indicated above, a juvenile court order may be modified or vacated if the court determines that such action is "in the best interest of the child or the public." Md. Rule 11–116(a). When making this decision, the juvenile court has discretion whether to hold a hearing,[16] and even if it chooses to do so, the rules of evidence are relaxed. *See* Md. Rule 11–116(c) & (d).

Here, the juvenile court proceeded with a hearing, recessed, and then months later, determined that "no further hearing in this matter is warranted." It then denied Elrich's motion to vacate without deciding whether Elrich's delinquency counsel had, in fact, provided effective assistance of counsel. Instead, it predicated its decision on the belief that, if the court were to grant Elrich's requested relief, "there would be a strong argument that re-trial would be barred by the Double Jeopar-

---

**16.** Notwithstanding this general rule, a hearing is required if "the relief sought ... is for revocation of probation and for the commitment of [the juvenile]." Md. Rule 11–116(c).

dy clause." The Circuit Court reasoned that, while Elrich's motion attacked his counsel's failure to mitigate the seriousness of the charge against him, it never suggested that he was innocent of committing a delinquent act. Thus, it concluded, "[i]t would not be in this child's best interests to simply terminate these proceedings with no further supervision or services." Nowhere in its opinion, however, did the court address whether the evidence was sufficient to show that Elrich had engaged in an act of arson or even attempted arson.

Without opining whether the evidence supported a finding that delinquency counsel was effective or that Elrich committed a delinquent act, we believe that the juvenile judge abused her discretion when she denied Elrich's motion without deciding either issue. Clearly the judge was aware that her primary consideration, according to Rule 11–116, was Elrich's best interest. We do not see, however, how her cursory denial of his motion facilitated that end. Elrich's allegations of ineffective assistance of counsel, if true, would cast enough doubt on his earlier delinquency proceedings to compromise the very foundation of his confinement. At the earlier hearing, the parties agreed to proceed on a set of stipulated facts, meaning that Elrich waived his right to "confront and cross-examine witnesses, call witnesses in his own defense, [or] to testify in his defense." Thus, delinquency counsel's failure to contest the voluntariness of Elrich's confession or the sufficiency of the State's evidence may have been a critical error.[17] Consequently, in the subsequent Rule 11–116 hearing, the critical error was the judge's decision not to investigate, at all, Elrich's ineffective assistance of counsel claim. Upon striking the Affidavit, the court should have deferred decision until

---

**17.** Additionally, delinquency counsel's alleged failure to advise Elrich of his right to except to the Master's findings may have adversely affected Elrich's ability to directly appeal his delinquency finding. Thus, contrary to the State's argument, if counsel's supposed incompetence foreclosed Elrich's ability to challenge the sufficiency of the evidence on direct appeal, he may use his Rule 11–116 motion to contest the sufficiency of the evidence as part of his ineffective assistance of counsel claim.

new counsel was appointed, or until it was satisfied that DeSimone's continued representation would not perpetuate the coercive circumstances. Once the court surmounted that obstacle, it should have determined whether Elrich had been denied his right to counsel. *Cf.* Md. Rule 11–106(a) ("[A juvenile] is entitled to be represented in all [juvenile court] proceedings . . . by counsel retained by him, his parent, or appointed. . . ."); *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) ("[T]he right to counsel is the right to the effective assistance of counsel.").

We are not persuaded by the State's assertion that the juvenile court properly rejected Elrich's motion because it determined that there was no evidence to suggest that Elrich was innocent of committing any delinquent act, even if he had not engaged in first-degree arson. If the charge underlying a juvenile's confinement is not proven, it is not appropriate or in the child's best interest to compound the error by requiring the child to remain in State custody. Ultimately, if the court believed that Elrich should remain under State supervision because he committed a delinquent act—either first-degree arson or attempted first-degree arson—it should have made some findings as to that fact.

Accordingly, we hold that the juvenile court's failure to consider whether Elrich was denied effective representation or whether the evidence showed that he committed a delinquent act was contrary to Elrich's best interests, and thus, constituted an abuse of discretion.

## CONCLUSION

We hold that the juvenile court's order denying Elrich's Rule 11–116 motion to vacate is a final, appealable order. As to the merits, the court appropriately recognized that Elrich's ineffective assistance of counsel claims were a basis for relief under Rule 11–116. Furthermore, the juvenile judge's knowledge of the OPD's supervision program did not warrant her recusal from the case. The judge did err, however, in failing to consider whether Elrich had adequate representation or

whether the evidence against him supported the finding that he engaged in a delinquent act. Finally, while the court had the discretion to appoint new counsel where a possible conflict of interest existed, the court erred when it required the OPD to panel the case to outside counsel. On remand, the juvenile court shall provide the OPD with the opportunity to avoid the potentially coercive situation by assigning an attorney to Elrich's case who could not conceivably exercise any influence or control over his delinquency counsel's employment. The court should then make findings as to Elrich's ineffective assistance of counsel and insufficiency of evidence claims.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE DIVIDED EQUALLY BETWEEN PETITIONER AND RESPONDENT.**

Chief Judge BELL, Judges GREENE and ELDRIDGE join in judgment only.

BELL, C.J., concurring in judgment only which GREENE and ELDRIDGE, JJ., join.

Among the rulings by the Circuit Court for Baltimore County at issue in this case is the correctness of its order that it be "paneled," by the Office of the Public Defender, to outside counsel. The majority, despite endorsing the court's decision to order removal of post-delinquency counsel, holds that order to be error. For the reasons detailed in *Office of the Public Defender v. State,* 413 Md. 411, 437–474, 993 A.2d 55, 71–94 (2010) (Bell, C.J. Dissenting and Concurring) and *Workman v. State,* 413 Md. 475, 490–491, 993 A.2d 94, 103 (2010) (Bell, C.J. Concurring), I agree with that holding, as do Judges Greene and Eldridge, and, therefore, for the reasons therein stated, we join in the Court's judgment only.